AO-106 (Rev. 06-09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

FILED

for the

Northern District of Oklahoma

AUG 11 2023

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

In the Matter of the Search of
A BLACK 2022 BMW, MODEL COUPE, VIN:
WBA53AK08N7K12947 CURRENTLY IN THE
POSSESSION OF BELL'S WRECKER SERVICE,
LOCATED AT ROUTE 2 BOX 110, HWY 169 &
WATOVA, NOWATA, OKLAHOMA 74048, AND THE
DEVICES LISTED ON ATTACHMENT A,
CURRENTLY LOCATED AT THE U.S. SECRET
SERVICE, TULSA RESIDENT OFFICE, 125 W. 15TH
STREET, SUITE 400, TULSA, OKLAHOMA 74119

)
)
)
)
)
)

Case No.  23MJ 429-PJC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 471 | **Obligations or Securities of United States** |
| 18 U.S.C. § 472 | **Uttering Counterfeit Obligations or Securities** |

The application is based on these facts:
**See Affidavit of USSS SA Robert Idoux, attached hereto.**

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

USSS SA Robert Idoux
*Printed name and title*

Subscribed and sworn to by phone.

Date: 8/11/23

City and state:  Tulsa, Oklahoma

*Judge's signature*

~~Jodi E. Jayne,~~ U.S. Magistrate Judge
*Printed name and title*

Paul J. Cleary
U.S. Magistrate Judge
333 W. 4th Street
Room 3355 U.S. Courthouse
Tulsa, OK 74103

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE SEARCH
OF A BLACK 2022 BMW, MODEL
COUPE, VIN: WBA53AK08N7K12947
CURRENTLY IN THE POSSESSION
OF BELL'S WRECKER SERVICE,
LOCATED AT ROUTE 2 BOX 110,
HWY 169 & WATOVA, NOWATA,
OKLAHOMA 74048, AND THE
DEVICES LISTED ON
ATTACHMENT A, CURRENTLY
LOCATED AT THE U.S. SECRET
SERVICE, TULSA RESIDENT
OFFICE, 125 W. 15TH STREET, SUITE
400, TULSA, OKLAHOMA 74119

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Robert Idoux, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search a black in color 2022

BMW, Model Coupe, Vehicle Identification Number WBA53AK08N7K12947,

(hereinafter "the Target Vehicle,"), further described in Attachment A, which is

currently in law enforcement possession and stored at Bell's Wrecker Service, Route

2 Box 110, Hwy 169 & Watova, Nowata, Oklahoma 74048, and the examination of

property – three electronic devices (hereinafter the "Devices") – which are currently

in law enforcement possession, and the extraction from the Target Vehicle and listed property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the United States Secret Service (USSS) and have been since July 2005. During my tenure with the Secret Service, I have been assigned to investigate violations of federal laws, including violations of Title 18 of the United States Code, and specifically Title 18, United States Code, Section 471 (Obligations or Securities of United States) and Title 18, United States Code, Section 472 (Uttering Counterfeit Obligations or Securities), as well as other violations of federal law. I received criminal investigative training at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the James J. Rowley Secret Service Training Center in Beltsville, Maryland, pertaining to criminal investigations of counterfeit currency, bank fraud, money laundering, wire fraud, access device fraud, and identity theft. I am an investigative and law enforcement officer of the United States, in that I am empowered by law to conduct investigations and to make arrests for felony offenses, under authority of Title 18, United States Code, Section 3056. I am also a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized to request such a warrant.

3.      I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 18, United States Code, Section 471 (Obligations or Securities of United States) and Title 18, United States Code, Section 472 (Uttering Counterfeit Obligations or Securities) will be located in the electronically stored information described in Attachment B and is recorded on the devices described in Attachment A.

## IDENTIFICATION OF THE VEHICLE AND DEVICE TO BE EXAMINED

5.      The Target Vehicle to be searched is a black in color 2022 BMW, Model Coupe, Vehicle Identification Number WBA53AK08N7K12947, which is currently in the possession and custody of Bell's Wrecker Service located at Route 2 Box 110, Hwy 169 & Watova, Nowata, Oklahoma 74048.

6.     The Devices to be searched are listed on Attachment A, and are each currently located at the United States Secret Service, Tulsa Resident Office, 125 W. 15th Street, Suite 400, Tulsa, Oklahoma 74119.

7.     The applied-for warrant would authorize the forensic examination of the Target Vehicle and the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.     On July 10, 2023, your Affiant was contacted by Deputy Richard Walters of the Nowata County Sheriff's Office regarding the arrest of two individuals for the Possession of Counterfeit Currency. Deputy Walters reported that on July 9, 2023, at approximately 2:54 am, he initiated a traffic stop on the Target Vehicle for Reckless Driving (traveling 101 miles per hour in a 65 mile per hour zone). As Deputy Walters was speaking to the driver, later identified as Elighjah Conti, he observed that Conti's hands and voice were shaking and that he appeared to be very nervous. Deputy Walters also observed that the right front passenger, later identified as Raheem Davis, was laying in an awkward position, and appeared to be pretending to be asleep. Deputy Walters asked Conti where they were traveling and Conti stated that he and Davis were electricians and were traveling from Tampa, Florida, to a job site in St. Louis, Kansas (*sic*). As Deputy Walters was speaking to Conti, he observed that Conti had a cellular phone plugged into the center console area, which displayed

4

the GPS information on the touch screen located above the center console. Conti showed Deputy Walters the GPS information which indicated they were approximately 200-250 miles from their destination. Deputy Walters stated that he is from the St. Louis, Missouri, area and knows that St. Louis is approximately 400 miles from Tulsa, Oklahoma. Deputy Walters believed that Conti and Davis were traveling to an area south of Kansas City, Missouri because Kansas City is approximately 270 miles from Tulsa, Oklahoma.

9.      Deputy Walters subsequently obtained Conti's Florida driver's license and Davis's Florida learner's permit and returned to his patrol vehicle where he conducted record checks on the Target Vehicle and both identification cards. The resulting record checks confirmed that the Target Vehicle was registered to Sixt Rent a Car, LLC, and that Conti's driver's license was not valid. The records check also confirmed that Davis did not have a driver's license and that he only had a Florida learner's permit.

10.     Deputy Walters, along with Officer Travis Goodman of the Nowata Police Department, returned to the Target Vehicle where Deputy Walters spoke with Davis and Officer Goodman spoke with Conti. When Davis rolled down his passenger side window, Deputy Walters could smell a very strong odor of marijuana coming from inside the vehicle. Deputy Walters instructed Davis to exit the vehicle where he questioned him about his travel destination. Davis responded that he was

5

an apprentice electrician and was traveling to St. Louis, Kansas (*sic*) for work. When Deputy Walters asked Davis how much marijuana was inside the vehicle, Davis hesitated and mumbled something under his breath before stating he had a medical marijuana card from Florida. When Deputy Walters asked Davis again if there was any marijuana inside the vehicle, Davis reiterated that he had a medical marijuana card, but he was unable to produce the card.

11.    As Deputy Walters was speaking to Davis, Officer Goodman approached him and reported smelling an odor of marijuana coming from inside the vehicle. Deputy Walters then approached Conti and instructed him to exit the vehicle. Deputy Walters informed Conti and Davis that he was going to conduct a probable cause search of the vehicle due to the odor of marijuana coming from inside the vehicle. In response, Conti admitted that he and Davis had smoked marijuana a few hours prior to the traffic stop. As Deputy Walters searched the back seat area of the vehicle, he observed that the back seat was loose, so he pulled on the back seat and discovered that several $100.00 bills had been hidden underneath the seat. Deputy Walters subsequently recovered 168 $100.00 bills ($16,800.00) that he identified as counterfeit, along with a vehicle rental jacket from underneath the back seat. The vehicle rental jacket had the following information written on the front: "Naomi" "813-564-8845" "RA-9492860226."

6

12.     Conti and Davis were consequently arrested for Possession of
Counterfeit Currency and transported to the Nowata Police Department, 114 S
Maple Street, Nowata, Oklahoma 74048, for questioning. The Target Vehicle was
subsequently towed to Bell's Wrecker Service, Route 2 Box 110, Hwy 169 &
Watova, Nowata, Oklahoma 74048, where it is currently being held on behalf of the
Nowata County Sheriff's Office.

13.     Continuing on July 9, 2023, while at the Nowata Police Department,
Deputy Walters verbally read Conti his Miranda rights, which Conti stated he
understood, but refused to answer any questions without an attorney present. Deputy
Walters then verbally read Davis his Miranda rights, which Davis stated he
understood and agreed to answer questions without an attorney present. Davis stated
that he left Florida on Friday evening, which indicated he left on Friday, July 7,
2023. Davis stated he and Conti periodically stopped for gas, food, and sleep along
their route, but he refused to provide any specific details regarding these locations.
Davis stated that the vehicle rental jacket located inside the vehicle was the rental
agreement and that the vehicle had been rented by his girlfriend, but he refused to
provide her name. When Deputy Walters asked Davis where the rental agreement
was located inside the vehicle, Davis stated it should have been in the center console.
When Deputy Walters informed Davis that the rental agreement was located
underneath the back seat along with 168 counterfeit $100.00 bills, Davis feigned
shock and stated that was impossible. When Davis was asked why the rental

7

agreement was located underneath the back seat with 168 counterfeit $100.00 bills, Davis stated he did not know and reiterated that it was impossible that there was any counterfeit money inside the vehicle. Davis then declined to answer any further questions without an attorney present. The interview was promptly terminated, and Conti and Davis were transported to the Nowata County Jail where Conti was charged with Second Degree Forgery, Conspiracy, Reckless Driving, and Operating a Motor Vehicle without a Driver's License while Davis was charged with Second Degree Forgery and Conspiracy.

14.    On July 11, 2023, your Affiant conducted a criminal history query on Conti and Davis and discovered that Davis had an extensive criminal history which included arrests in Georgia (June 2022), North Carolina (October 2022), and Florida (December 2022) – each of which involved the Possession of Counterfeit Currency. A further review of Davis's criminal history confirmed that Davis had previously been sentenced to 5 years' probation in Georgia and 2 years' probation in Florida, both for Possession of Counterfeit Currency.

15.    On July 12, 2023, your Affiant obtained a copy of the incident report from the Camden County, Georgia, District Attorney's Office regarding Davis's arrest in June 2022 for the Possession of Counterfeit Currency. The incident report stated that Davis was the driver of a vehicle that was stopped by the Camden County Sheriff's Office on June 23, 2022, for driving 95 miles per hour in a 70 miles per hour

zone. Upon contacting the vehicle's driver (Davis) and passenger, the deputy could smell a strong odor of marijuana coming from inside the vehicle. When the deputy asked Davis if he owned the vehicle, Davis stated "his people rented it for him." A subsequent search of the vehicle resulted in the recovery of several counterfeit $100.00 bills from Davis and his passenger, as well as from other areas within the vehicle, including the back seat area. Similar to what occurred during the Nowata County incident, the counterfeit currency recovered from the back seat area of the vehicle had been hidden underneath the back seat and consisted of 34 counterfeit $100.00 bills and 49 uncut counterfeit $100.00 bills.

16.     On July 20, 2023, your Affiant responded to the Nowata County Sheriff's Office, 229 N Maple Street, Nowata, Oklahoma 74048, where I took possession of the counterfeit currency and three cellular phones. Your Affiant subsequently examined all 168 $100.00 bills and confirmed they were counterfeit based on the absence of basic security features such as the watermark and color shifting ink. Also, all 168 $100.00 bills shared one of three unique serial numbers: 51 bills listed serial number LH79819861A, 54 bills listed serial number PK09685413D, and 63 bills listed serial number PA34054442B.

17.     On August 1, 2023, your Affiant entered the aforementioned serial numbers into the United States Secret Service's Counterfeit Tracking Application (CTA), which reported that counterfeit $100.00 bills with these three serial numbers

were passed on July 5, 2023, at businesses in Ocala, Florida; Williston, Florida; and Gainesville, Florida. Additional counterfeit bills with these serial numbers were passed on July 7, 2023, at a business in Fort Walton Beach, Florida. Ocala, Williston, and Gainesville are located north of Tampa, Florida, while Fort Walton Beach is located west of Ocala, Williston, and Gainesville in the panhandle of Florida. This direction of travel matches Davis's statement to Deputy Walters that he and Conti left Florida on Friday, July 7, 2023. It is believed that Conti and Davis passed additional counterfeit $100.00 bills while traveling from Florida to Oklahoma. It is also believed that Conti and/or Davis had their cellular phones plugged into the center console area of the Target Vehicle during their travel from Florida to Oklahoma, which would enable any GPS information to be stored in the Target Vehicle's infotainment module.

18.     The Target Vehicle is currently in the possession and custody of Bell's Wrecker Service, Route 2 Box 110, Hwy 169 & Watova, Nowata, Oklahoma 74048, where it is currently held on behalf of the Nowata County Sheriff's Office. The Devices are currently in the lawful possession of the United States Secret Service, Tulsa Resident Office. They came into the United States Secret Service's possession in the following way: received from the Nowata County Sheriff's Office. Therefore, while the United States Secret Service might already have all necessary authority to examine the Target Vehicle and the Devices, I seek this additional warrant out of an

10

abundance of caution to be certain that an examination of the Target Vehicle and the Devices will comply with the Fourth Amendment and other applicable laws.

19.     Based on my training and experience, I know that conspirators in a criminal enterprise, such as producing, transporting, and passing counterfeit currency, often use cellular phones to communicate with each other about such counterfeiting activity.

20.     In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the United States Secret Service.

## TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS

21.     Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

     a. Many modern motor vehicles are equipped with sensors, cameras,[1] transmitters, and electronic control units (ECUs)[2] to monitor and

---

[1] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

[2] "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each

11

manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.[3] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

b. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems – sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

c. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to

---

motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

[3] The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

d.  A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed, or brakes were engaged.

e.  The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information, such as vehicle use data, maintenance requirements, and automotive servicing-about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle

13

telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "Mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

f.  The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

g.  I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses,

14

associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

h. As previously stated, the Target Vehicle is a black in color 2022 BMW Coupe, Vehicle Identification Number WBA53AK08N7K12947, which is currently in the possession and custody of Bell's Wrecker Service, Route 2 Box 110, Hwy 169 & Watova, Nowata, Oklahoma 74048, in the Northern District of Oklahoma. To complete a forensic extraction, law enforcement may need to relocate the vehicle. This relocation is due to the time involved in accessing and downloading the information contained in the vehicle.

i. It may also be necessary, temporarily, to remove trim and other components of the Target Vehicle to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from

15

computers and other electronic storage containers that may be found
within the Target Vehicle. In the event that potentially destructive
processes are required to perform this extraction, parts of the Target
Vehicle may be destroyed and rendered useless.

j.   Furthermore, it may be necessary to return to the Target Vehicle and
reconnect the infotainment and telematics systems to the Target
Vehicle's power source to perform the extraction using forensic
software. This is because there are various computer networks working
simultaneously when a vehicle is powered on, and in some vehicles, the
infotainment and telematics systems require the other networks to work
in tandem to complete the data extraction.

## TECHNICAL TERMS

22.   Based on my training and experience, I use the following technical
terms to convey the following meanings:

b.   Wireless telephone:  A wireless telephone (or mobile telephone, or
cellular telephone) is a handheld wireless device used for voice and data
communication through radio signals.  These telephones send signals
through networks of transmitter/receivers, enabling communication
with other wireless telephones or traditional "land line" telephones.  A
wireless telephone usually contains a "call log," which records the

telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS

18

antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the

19

structure of the Internet, connections between devices on the Internet

often cross state and international borders, even when the devices

communicating with each other are in the same state.

23.     Based on my training, experience, and research, I know that the

Devices have varying capabilities that, at least for the listed cellular phones, allow

them to serve as a wireless telephone, digital camera, portable media player, GPS

navigation device, and PDA. In my training and experience, examining data stored

on devices of this type can uncover, among other things, evidence that reveals or

suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24.     Based on my knowledge, training, and experience, I know that

electronic devices can store information for long periods of time. Similarly, things

that have been viewed via the Internet are typically stored for some period of time on

the device. This information can sometimes be recovered with forensics tools.

25.     *Forensic evidence.* As further described in Attachment B, this application

seeks permission to locate not only electronically stored information that might serve

as direct evidence of the crimes described on the warrant, but also forensic evidence

that establishes how the Device was used, the purpose of its use, who used it, and

when.  There is probable cause to believe that this forensic electronic evidence might

be on the Device because:

20

b. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

c. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

e. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information

21

necessary to understand other evidence also falls within the scope of the warrant.

    f.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

27.   *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Vehicle and Devices described in Attachment A to seek the items described in Attachment B.

29.     I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Robert W. Idoux
Special Agent
United States Secret Service

Subscribed and sworn to before me
on August 1?, 2023:

TODD JAYNE
UNITED STATES MAGISTRATE JUDGE

Paul J. Cleary
U.S. Magistrate Judge
333 W. 4th Street
Room 3355 U.S. Courthouse
Tulsa, OK 74103

23

## ATTACHMENT A

### Property to be Searched

The property to be searched is the infotainment and telematics systems contained in a black in color 2022 BMW, Model Coupe, Vehicle Identification Number WBA53AK08N7K12947, hereinafter "the Target Vehicle," which is currently in the possession and custody of Bell's Wrecker Service located at Route 2 Box 110, Hwy 169 & Watova, Nowata, Oklahoma 74048.

The additional property to be searched consists of three cellular phones listed below, hereinafter "the Devices." The Devices are currently located at the United States Secret Service, Tulsa Resident Office, 125 W. 15th Street, Suite 400, Tulsa, Oklahoma 74119.

1. Apple iPhone cellular phone with a white label on back with "Chanel Smith 813 4599557." The phone is enclosed with a blue plastic case and cracked on the back.

2. Black-colored Tracfone cellular phone, model BLU, and no visible identifiers.

3. Samsung Galaxy cellular phone. Black-colored with cracked screen and no visible identifiers.

This warrant authorizes the forensic examination of the Target Vehicle's infotainment and telematics systems and the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

1.      All electronically-stored information on the Target Vehicle's infotainment and telematics systems described in Attachment A that relate to violations of Title 18, United States Code, Section 471 (Obligations or Securities of United States) and Title 18, United States Code, Section 472 (Uttering Counterfeit Obligations or Securities), those violations involving Elighjah Conti and Raheem Davis and occurring on or after July 7, 2023, including:

   a. Information stored in the vehicle's infotainment and telematic systems that show who, if any, had a connected device such as a cellular telephone and the identification associated with any connected device;

   b. All historical navigation data tracks, routes, and waypoints, GPS fixes, favorites, past journeys, trip logs, and user entered data, latitude, longitude, and altitude coordinates, and related dates and times; and

   c. Stored electronics data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within the Target Vehicle, including, but not limited to:

      • Unique device identifiers, media files, call logs, contact lists, text messages,  SMS messages, Bluetooth connections, USB connections, voice commands, voice recordings, voice calling,

Web browser history, Wi-Fi connections, speech recognition, time updates, track logs, traction events, traffic updates, stop/start log, GPS warnings, hard acceleration, hard braking, light status, odometer reading, gear shifts, historical speed data, historical event data, and data streaming services and related content.

2.    All records on the Devices described in Attachment A that relate to violations of Title 18, United States Code, Section 471 (Obligations or Securities of United States) and Title 18, United States Code, Section 472 (Uttering Counterfeit Obligations or Securities)including:

a.  Records and information relating to geolocation and travel in furtherance of the criminal violations;

b.  Records relating to communication with others as to the criminal violations; including incoming and outgoing voice messages; text messages; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

c.  Threatening communications related to the criminal violations;

2

d. Records relating to documentation or memorialization of the criminal violations, including voice memos, photographs, videos, and other audio and video media, and all EXIF information and metadata attached thereto including device information, geotagging information, and information of the relevant dates to the media;

e. All bank records, checks, credit card bills, account information, and other financial records. Records relating to financial data, to include bank records, checks, credit card bills, account information, and other financial records, electronically stored records showing proof of residence, proof of storage unit use and/or rentals, additional properties owned or documents reflecting stash houses, real estate transaction documents, rental agreements or documents, as well as automotive sale or purchase or financing documents, electronically stored documents purporting to indicate income or salaries received reflecting employment, hours worked, wages earned, withholdings, W-2 and W-4 forms, (blank or executed), state and federal tax returns or documents pertaining to the preparation thereof, electronically stored records showing secret clientele lists, business associates, and diversification of wealth, United States Currency, any other electronically stored tangible items evidencing the obtaining, transfer, secreting, and/or concealment of assets and/or money, electronically stored records, documents,

3

receipts, and/or negotiable instruments which evidence the purchase of

negotiable instruments and/or the structuring of currency transactions

to avoid the filing of currency transactions reports and/or the

laundering of monetary instruments, electronically stored documents

evidencing fruits, instrumentalities, monies, records, and notations,

associated with the crimes listed above.];

f.  Evidence of user attribution showing who used or owned the Devices at

the time the things described in this warrant were created, edited, or

deleted, such as logs, phone books, saved usernames and passwords,

documents, and browsing history; and

g.  All records and information related to the coordination, agreement,

collaboration, and concerted effort of and with others to violate the

criminal violations.

As used above, the terms "records" and "information" include all of the

foregoing items of evidence in whatever form and by whatever means they may have

been created or stored, including any form of computer or electronic storage (such as

flash memory or other media that can store data) and any photographic form.

4